***********
The Full Commission has reviewed the two Deputy Commissioner Opinions and Awards based on the record of the proceedings before the Deputy Commissioners; the appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinions and Awards with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered by the parties in a Pre-Trial Agreement, marked as Stipulated Exhibit (1) and at the hearing as:
 STIPULATIONS
1. On 17 September 1998, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between plaintiff-employee and defendant-employer on 17 September 1998.
3. All parties are properly before the Industrial Commission, which has jurisdiction over the parties and the subject matter.
4. On the relevant times herein, the carrier on the risk was Zurich Commercial.
5. Plaintiff's average weekly wage and corresponding compensation rate will be determined by an Industrial Commission Form 22 Wage Chart to be submitted by defendants.
6. The issue to be determined is to what amount of compensation, if any, is plaintiff entitled to as the result of injuries sustained on 17 September 1998.
 ***********
Based upon the competent evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. On the date of the evidentiary hearing before Deputy Commissioner Houser, plaintiff was fifty-five (55) years of age and was living in Kinston, North Carolina. Plaintiff's work history consists mainly of jobs involving heavy equipment operation. Plaintiff also worked in construction for approximately ten years, as a lawn mower mechanic for approximately five years and as a truck driver for two years.
2. On 17 September 1998, plaintiff, who then lived in Raleigh, was operating heavy equipment and counting dump trucks in his employment with defendant-employer. As plaintiff was walking across a road in a construction area, he was struck by an automobile. As the result of this incident plaintiff sustained serious and permanent injuries.
3. At the time of his injury, plaintiff was working on a construction site for what is now known as Interstate 540. The job site in Raleigh, North Carolina, was more than a mile long and had portable toilets and water available for employees at each end of the project. In addition, periodically throughout the day, defendant-employer would drive through the job site with a truck which contained a water cooler. Plaintiff, weather permitting, was working from 6:30-7:00 a.m. to 6:00 p.m. or later, Monday through Friday, and every other Saturday. Defendant provided a thirty minute lunch break daily.
4. On 17 September 1998, plaintiff was assigned to count trucks on a mid-point in the construction site. During a lull in the activity, plaintiff desired to take a break and chose to proceed to a local convenience store. The convenience store was closer to plaintiff than the water and toilet facilities provided by defendant-employer. In addition, the convenience store included products for refreshment that were not provided at defendant-employer's stations. On prior occasions plaintiff had been permitted to go to the convenience store to take care of his personal needs, including to make a personal telephone call and to get a drink. Plaintiff and other employees were often taken to the convenience store for lunch by defendant-employer during their lunch period. Other employees had gone to the convenience store from the construction site for their personal needs. The convenience store was the closest facility to the job site where food and drink could be purchased.
5. On 17 September 1998, at approximately 3:30 p.m., when there were no trucks to be loaded and counted, plaintiff walked to the convenience store, purchased an ice cream, and was returning to the construction site when he was struck by an automobile and was injured.
6. Following the incident, plaintiff was transported by ambulance to the emergency room at Wake Medical Center. Plaintiff was diagnosed as having bilateral hip dislocations, a lacerated spleen, right acetabular fracture, bilateral pneumothorax, lacerations of the right thigh and calf, multiple abrasions to the head, four broken teeth and a pancreatic contusion. Plaintiff underwent surgery for closed reduction of his bilateral hip dislocations, incision and drainage of the right thigh laceration and bilateral chest tube placement.
7. Following his surgical procedures, plaintiff underwent orthopaedic and physical therapy as well as speech pathology consultations. Additionally, during his hospitalization, plaintiff developed a problem with urinary retention and the use of a Foley catheter was necessary.
8. On 28 September 1998, plaintiff was evaluated, and it was determined that he could be released from the hospital and cared for at home with home-health care. Plaintiff was discharged from Wake Medical Center on 29 September 1998. As of that date, he continued to experience problems with his speech.
9. Following his discharge from the hospital, plaintiff did not receive home-health care because he did not have health insurance or a source of income. Plaintiff was, however, able to continue treatments with Dr. Obremsky through April of 1999. During this period, plaintiff had to use a wheelchair and then a walker to get around and his speech did not improve. In April 1999, Dr. Obremsky noted that plaintiff was developing degenerative disease in his hips as a result of the injuries he sustained on 18 September 1998.
10. During this period plaintiff was also questioned while at Wake Medical Center regarding payment of his outstanding medical bills. Plaintiff was unable to make any payments and was informed that he would have to make arrangements to do so in order to continue treating through the hospital's orthopaedic department. Thereafter, plaintiff was uncomfortable returning to the orthopaedic clinic on a regular basis, yet continued experiencing increased pain and discomfort in his hips with the advancing degeneration.
11. In September 1999, plaintiff was unable to urinate and returned to the emergency room at Wake Medical Center. Use of a Foley catheter was again necessary and plaintiff was instructed to follow up with a urologist. Plaintiff did not have any means to pay for such treatment, so he was unable to follow up as instructed. Plaintiff continued to have voiding problems and these required him to return to the emergency room on 18 October 1999 for another catheter placement. Plaintiff did not have any problems with voiding urine prior to being injured on 18 September 1998.
12. Because plaintiff continued to have significant problems with hip pain, he returned to see Dr. Obremsky in March of 2000. Dr. Obremsky opined that plaintiff had previously been unable to return to his prior employment, and that if he did return to work for defendant-employer, that plaintiff would be capable of only a sedentary job that required minimal standing and walking. Dr. Obremsky testified at his deposition that in his opinion, plaintiff should have been able to resume some type of sedentary type work that required minimal standing and walking approximately six months after the 18 September 1998 incident.
13. Dr. Obremsky further opined that at some time in the future, plaintiff would require total hip replacement. Dr. Obremsky assigned plaintiff a fifteen percent (15%) permanent partial disability rating to his right lower extremity and a seven percent (7%) rating to the left lower extremity. According to Dr. Obremsky, plaintiff would be out of work for three to four months after a hip replacement surgery and his impairment ratings would change.
14. During this ongoing period of medical problems and treatment, plaintiff did not have any source of income. As the result, plaintiff lost his home, had a judgment entered against him for past due rent, and lost his automobile. Unable to find affordable housing or suitable work in Wake County, plaintiff moved to Kinston, North Carolina so that family members could assist him. After moving to Kinston, plaintiff applied to numerous car dealerships for a lot attendant or cleaning position, but was unsuccessful with this job search effort. Plaintiff also attempted to locate work at various automobile service businesses. Plaintiff submitted applications and talked with supervisory personnel in at least eight such businesses. Plaintiff did not receive a response from any of his inquiries or applications. The Full Commission finds that plaintiff's attempts to locate suitable employment were reasonable.
15. The deposition of Ms. Kathy Crosby of Corvel Corp., a vocational rehabilitation professional, was taken on 21 March 2001. Ms. Crosby submitted a labor market survey covering the Wake County area for the time period of 24 January 2001 through 8 March 2001. Ms. Crosby testified that she looked into the areas of employment that she believed coincided with plaintiff's work restrictions and for the types of jobs plaintiff had previously sought, those primarily in the automobile service industry.
16. Ms. Crosby testified that she reviewed plaintiff's medical records and work restrictions prior to conducting a labor market survey. Ms. Crosby indicated in her labor market survey that plaintiff had a speech impediment, but had not heard plaintiff speak. Ms. Crosby further testified that she conducted the survey to determine what employment was available for plaintiff in the Wake County area. Plaintiff, however, now lives in Kinston which is in Lenoir County, North Carolina, approximately seventy five miles away from Wake County. Ms. Crosby admitted during her deposition that she did not know that plaintiff lived in Kinston, that the survey would not apply to Lenoir County and that she had no opinions regarding available employment in that county.
17. In her labor market survey, Ms. Crosby identified three security guard companies that had sedentary work available. Ms. Crosby testified that these companies would tailor the position to the applicant if necessary. The security guard positions identified required patrolling and examining doors, windows and gates on industrial or commercial properties. As such, these positions were not suitable given plaintiff's work restrictions in that they would require plaintiff to walk more than recommended and would require repeated squatting and stooping.
18. Ms. Crosby also identified seven service clerk positions at local car dealerships in her labor market survey. The requirements for those positions included talking with customers regarding service needs and writing up the requests. The service clerk positions required people oriented applicants and four of the seven required some previous experience. Of the seven positions identified, none of them were hiring at the time Ms. Crosby conducted her survey.
19. Based upon plaintiff's condition and work restrictions, along with the fact that Ms. Crosby's labor market survey was not for the area in which plaintiff resides, the jobs identified in said survey are found to be unsuitable.
20. Plaintiff has produced sufficient medical evidence upon which to find that due to the incident of 18 September 1998, he is capable of some work, but that after a reasonable effort to locate employment on his part, he has been unsuccessful.
21. Defendants have failed to produce evidence that suitable jobs were available to plaintiff or that he was capable of obtaining one given his physical and vocational restrictions which are reasonably near plaintiff's residence. Although the Commission acknowledges that an employee may not relocate in order to make his disability more likely, when the employee relocates for legitimate reason, such as in this case, vocational evidence should be relevant to the area where he is residing. The Full Commission finds that the vocational evidence tendered in this case is not relevant to the community where plaintiff is living.
22. As a result of the work related incident of 18 September 1998, plaintiff has been unable to earn wages in his former position with defendant-employer or in any other employment for the period of 18 September 1998 through the present and continuing.
23. Plaintiff's average weekly wage on 18 September 1998 was $459.32, yielding a compensation rate of $306.37 per week.
24. There is no evidence in the record that defendant-employer provided formal break times for their employees. It appears that employees were able to take a break as and when their work load permitted. Further, defendant-employer did not provide a place to take breaks, and although there was suggestion that the employees could have accepted the water offered by defendant-employer, the evidence is that employees were permitted and did go to the convenience store to obtain refreshment and to take care of their personal needs.
25. Although defendant-employer did provide portable toilets and water, these conveniences were not located at the station where plaintiff was working on 18 September 1998, and the convenience store was closer to the plaintiff than the defendant-employer's water and toilet facilities.
26. Based on the greater weight of the competent evidence, the Full Commission finds that plaintiff was in the course and scope of his employment at the time and place of his injury and that plaintiff had not deviated from his employment. North Carolina has adopted the personal convenience doctrine and recognizes that employees have not deviated from their employ while reasonably taking breaks, using toilet facilities, seeking refreshment, and otherwise taking care of their personal needs. The Full Commission finds that plaintiff was entitled to take a break and was permitted to go to the convenience store. Defendant-employer has not established that it had an enforced policy requiring its employees to stay on the job site; to the contrary, the evidence is that defendant-employer had permitted plaintiff and other employees to proceed to the convenience store to obtain refreshment, make personal telephone calls, and otherwise to take care of their needs. Plaintiff's job foreman, Chester Downey, did not testify that plaintiff erred in going to the convenience store. To the contrary, Mr. Downey indicated that if he knew that plaintiff wanted to go to the convenience store that he would have arranged transportation to take him to the store. In addition, there was no evidence that plaintiff's pay was or would be docked for taking a break at the convenience store.
 ***********
Based on the foregoing findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage on 18 September 1998 was $459.32, yielding a compensation rate of $306.37 per week. G.S. § 97-2(5).
2. Plaintiff has sustained an injury arising out of and in the course of his employment including injury to his hips and other parts of his body as detailed in Finding of Fact No. 6. G.S. § 97-2(6). Plaintiff's activity in proceeding to the convenience store and purchasing an ice cream during a lull in his employment falls within the personal convenience doctrine and thereby his injury arises out of and in the course of his employment. See Rewis v. New York Life Insurance Co.,226 N.C. 325, 38 S.E.2d 97 (1946); Shaw v. Smith Jennings, Inc.,130 N.C. App. 442, 503 S.E.2d 113, disc. rev. denied, 349 N.C. 363,525 S.E.2d 175 (1998); Spratt v. Duke Power Co., 65 N.C. App. 457,310 S.E.2d 38 (1983); Harless v. Flynn, 1 N.C. App. 448, 162 S.E.2d 47
(1968); 1 Larson's Workers' Compensation Law § 15.54. In determining whether an off-site injury is included in the personal convenience doctrine, several factors can be considered including: (1) the duration of the break period; (2) whether the employee is paid during the break period; (3) whether the employer provides a place for employee to take breaks, including vending facilities; (4) whether the employer permits off-premises breaks; and, (5) the proximity of the off-premises location where plaintiff was injured to the employment site. Shaw v. Smith Jennings, Inc., supra. Under the facts of this case, there were no formal break periods, there is no suggestion that plaintiff was away from work for an unusually long period of time, plaintiff and other employees were paid during their break periods, no vending machines or refreshment other than water was made available or provided by defendant-employer, off-premise breaks were permitted by defendant-employer, and the location of the convenience store was closer to plaintiff's work station than the water coolers made available to plaintiff. Thus, this injury is incidental to plaintiff's employment and does not constitute a deviation from his employment. Shaw v. Smith Jennings, Inc., supra. Further, at the time and place of his injury, plaintiff had not deviated from the business of his employer. Unlike the circumstances in Bowser v. N.C.Department of Correction, ___ N.C. App. ___, 555 S.E.2d 618 (2001), rev.den, 355 N.C. 283, 560 S.E.2d 796 (2002), and other cases, plaintiff was not provided with reasonable means for refreshment and comfort by his employer, and thereby his actions to cross the street for refreshment was not a deviation from his employment. Compare Shaw v. Smith Jennings,Inc., supra (leaving work site to obtain refreshment compensable where employer did not provide facilities for food and drink found compensable)with Bowser v. N.C. Department of Correction, supra (leaving work site to have a meal where employer provided meals, apparently declined by plaintiff, found not compensable).
3. Plaintiff is entitled to be paid by defendants ongoing total disability compensation at the rate of $306.37 per week for the period of 18 September 1998 through the present and continuing until such time as he returns to work or until further order of the Commission. G.S. §97-29.
4. Plaintiff is entitled to have defendants pay for all related medical expenses. G.S. § 97-25; G.S. § 97-25.1.
5. Defendants are entitled to a credit in the amount of $9,276.55 for third party proceeds previously received by plaintiff and for reimbursement to plaintiff for proceeds paid to Wake Medical Center for satisfaction of its lien. G.S. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $306.37 per week for the period of 18 September 1998 through the present and continuing until such time as he returns to work or until further order of the Commission. This compensation is subject to the credits, stated below, and is subject to the attorney's fee approved herein.
2. Defendants shall pay for all of plaintiff's medical expenses related thereto in accordance with the Act and Commission Rules. Those medical expenses include, but are not limited to, Wake Medical Center Emergency Room treatment in September and October of 1999 for plaintiff's urinary retention problems. Defendant is entitled to a credit for any medical expenses paid from plaintiff's third-party settlement, if any. The health care providers are entitled to be paid once, and are not entitled to a double recovery.
3. Defendants are entitled to a credit in the amount of $9,276.55 for third party proceeds previously received by plaintiff and for reimbursement to plaintiff for proceeds paid to Wake Medical Center for satisfaction of its lien.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the net compensation awarded to plaintiff in Paragraph 1 of this Award, after the off-set for the credit awarded in Paragraph 3 of this Award, is approved for counsel for plaintiff. From the amounts having accrued, this fee shall be deducted and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
5. Defendants shall pay the costs, including an expert witness fee for Dr. Obremsky's deposition.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER